# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP2318-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>  Plaintiff-Respondent-Petitioner,<br>v.<br>Alan M. Johnson,<br>  Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 393 Wis. 2d 688, 948 N.W.2d 377
PDC No:2020 WI App 50 - Published

| | |
|---|---|
| OPINION FILED: | June 16, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 19, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Walworth |
| JUDGE: | Kristine E. Drettwan |

JUSTICES:

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and DALLET, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion, in which ROGGENSACK, J., joined, and in which KAROFSKY, J., joined ¶¶1-3, 5-23, and 30-48.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant, there was a brief filed by *Catherine E. White, Stephen P. Hurley, Jonas B. Bednarek*, *Marcus J. Berghahn* and *Hurley Burish, S.C.*, Madison. There was an oral argument by *Catherine E. White*.

For the plaintiff-respondent-petitioner, there were briefs filed by *Timothy M. Barber*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Timothy M. Barber*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP2318-CR
 (L.C. No. 2016CF422)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

  **v.**

**Alan M. Johnson,**

    **Defendant-Appellant.**

**FILED**

**JUN 16, 2021**

Sheila T. Reiff
Clerk of Supreme Court

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and DALLET, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion, in which ROGGENSACK, J., joined, and in which KAROFSKY, J., joined ¶¶1-3, 5-23, and 30-48.

REVIEW of a decision of the Court of Appeals. *Affirmed in part, reversed in part.*

¶1 BRIAN HAGEDORN, J. In the middle of the night, Alan M. Johnson snuck into the home of his brother-in-law (K.M.) seeking evidence of child pornography. Johnson brought a gun. After searching K.M.'s computer for more than two hours, K.M. appeared in the doorway and saw Johnson. K.M. shut the door, as Johnson described it, and then burst through the door and attacked. The

ensuing altercation left K.M. dead; he was shot five times. A jury found Johnson guilty of first-degree reckless homicide. Johnson appealed his conviction, and the court of appeals ruled in his favor and ordered a new trial.[1]

¶2 Three issues are presented for our review. First, did the circuit court[2] err in failing to instruct the jury on perfect self-defense? Second, did the circuit court err in failing to instruct the jury on the lesser included offense of second-degree reckless homicide? And finally, did the circuit court err in precluding Johnson from offering evidence regarding what he found on K.M.'s computer the night of K.M.'s death? The court of appeals ruled in Johnson's favor on all three questions.

¶3 We agree the circuit court erred in failing to instruct the jury on perfect self-defense and second-degree reckless homicide. When determining whether these instructions should be provided, the evidence is viewed in the light most favorable to the defendant, and the instruction must be provided if evidence is presented from which a reasonable jury could find in the defendant's favor on the instructed elements. The evidence presented at trial was sufficient to satisfy this low evidentiary bar. We affirm the decision of the court of appeals on these grounds and remand for a new trial.

---

[1] State v. Johnson, 2020 WI App 50, ¶52, 393 Wis. 2d 688, 948 N.W.2d 377.

[2] The Honorable Kristine E. Drettwan, Walworth County Circuit Court, presiding.

2

¶4 However, we conclude the circuit court properly exercised its discretion in precluding Johnson from testifying regarding what he found on K.M.'s computer that night. The circuit court concluded this other-acts evidence was not relevant, and even if it was, the probative value of the evidence would be substantially outweighed by the danger of unfair prejudice. While another court might see it differently, this was a permissible and reasonable conclusion, particularly since Johnson was permitted to testify regarding why he was at K.M.'s house and that he "found" what he was looking for. Accordingly, we reverse the decision of the court of appeals on this ground.

## I.  BACKGROUND

¶5 Johnson testified in his own defense at trial. His testimony is the only narrative the jury heard of what happened the night K.M. died. Since our review is largely centered on a view of the evidence most favorable to Johnson, his testimony forms the substantial basis of our analysis. The following is Johnson's side of the story.

¶6 Johnson's oldest sister married K.M. when Johnson was a child; his relationship with K.M. was strained from the beginning. Johnson feared K.M. from the age of ten onward. Repeatedly, K.M. verbally and physically abused Johnson, and on one occasion, sexually abused him. Johnson also witnessed K.M. physically abuse his youngest sister and K.M.'s son.

¶7    Years prior to K.M.'s death, Johnson discovered what he believed was child pornography on K.M.'s computer.[3]  Eventually, Johnson reported this to the authorities, but was told that the evidence was "stale."  Johnson then told his father, who confronted K.M.  K.M. told Johnson's father the pornography was "moved."  Despite several requests by Johnson's father to attend therapy, K.M. never went.  This caused Johnson to fear for the safety of his nieces.

¶8    Around 11:45 p.m. on the night of October 24, 2016, Johnson went to K.M.'s home intending to discover "fresh pictures" of child pornography on K.M.'s computer to deliver to the police.  Johnson believed that K.M. could overpower him if anything happened, so he brought a gun to protect himself.  He entered through the unlocked back door and proceeded to the computer room.  Johnson closed the door and searched K.M.'s computer for over two hours.  As a result of his search, Johnson intended to turn what he discovered over to the police because he "found what they needed."

¶9    After the calendar flipped to October 25, at around 2:00 a.m., Johnson heard a "scuff" from somewhere in the house.  Then, in Johnson's words:  "I closed the Windows that I had opened on the computer . . . and I got up, I grabbed the gun.  I got everything that I had with me."  As he was leaving, the door opened

---

[3] Johnson testified that his sister, KM's wife, asked him to find a file she downloaded on KM's computer.  While attempting to locate the missing file, Johnson found what he believed was child pornography.

4

and Johnson saw K.M. standing in the doorway without a shirt. K.M. then closed the door, leaving Johnson alone in the room. Johnson was afraid. When K.M. opened the door, "[h]e looked right at me, and he knew why I was there. I knew that he knew." Johnson wanted to leave, but the only exit was the door K.M. had just shut. He did not believe the windows in the room opened either, leaving him no way to escape. Then, Johnson explained, "the door flew open and [K.M.] attacked me. He just came right at me." And upon further probing, Johnson said, "[K.M.] lunged at me. I saw him come at me." When all was said and done, K.M. sustained five gunshot wounds and died. Exactly how this transpired was unclear even to Johnson. While he knew he shot K.M., Johnson did not remember seeing or hearing his gun fire and does not remember how he left the house.

¶10 Johnson denied knowing how K.M. died when questioned on two occasions later that day. But before the day ended, he confessed to killing K.M. Johnson was charged with first-degree intentional homicide, use of a dangerous weapon, and armed burglary.

¶11 During pretrial, Johnson moved to admit other-acts and McMorris evidence[4] regarding K.M.'s past actions to support his

---

[4] "Evidence of a victim's violent character and past violent acts is often referred to as McMorris evidence." State v. Head, 2002 WI 99, ¶24 n.5, 255 Wis. 2d 194, 648 N.W.2d 413. The phrase refers to McMorris v. State, where this court noted when "the issue of self-defense is sufficiently raised" evidence of the victim's "dangerous character or reputation" "is relevant in determining whether the victim or the accused was the aggressor." 58 Wis. 2d 144, 149, 205 N.W.2d 559 (1973).

claim of self-defense. The circuit court permitted Johnson to introduce evidence of K.M.'s past abusive conduct and evidence that Johnson previously found what he believed was child pornography on K.M.'s computer. However, the court prohibited Johnson from presenting evidence of precisely what he believed he found on K.M.'s computer the night K.M. died: images of naked underage girls and over 5,000 images of neighborhood girls.[5] The court ruled that such evidence, regardless of whether it was child pornography, "is not relevant to the homicide, to any claim of self-defense or to the burglary charge." Furthermore, the court noted that even if this evidence was relevant, "it would fail under [Wis. Stat. §] 904.03" because "[i]t would be completely and unfairly prejudicial with little to no probative value other than to try and paint the victim in a bad light, and it certainly would not . . . substantially outweigh that unfair prejudice."

¶12 At the close of evidence, the circuit court instructed the jury on burglary, first-degree intentional homicide, second-degree intentional homicide, first-degree reckless homicide, and imperfect self-defense. Johnson also requested, without success, instructions on perfect self-defense, second-degree reckless homicide, and homicide by negligent use of a firearm. The circuit court refused to instruct on perfect self-defense because it

---

[5] Johnson made an offer of proof that he would testify to this effect, providing more specifics with respect to the images he viewed that night. Johnson made an additional offer of proof that a computer analyst would testify to discovering images on the computer that to a lay person would appear to be child pornography.

6

determined no reasonable person could conclude that Johnson satisfied either prong of the perfect self-defense standard. And the court did not instruct on second-degree reckless homicide on the grounds that Johnson's actions conclusively showed an utter disregard for human life.[6]

¶13 The jury found Johnson guilty of first-degree reckless homicide while armed with a dangerous weapon and not guilty of burglary. Johnson was sentenced to 25 years of confinement and 10 years of extended supervision.

¶14 Johnson appealed, and the court of appeals reversed and remanded for a new trial. State v. Johnson, 2020 WI App 50, ¶52, 393 Wis. 2d 688, 948 N.W.2d 377. The court of appeals concluded "the circuit court erred in denying Johnson's request to instruct the jury on perfect self-defense and second-degree reckless homicide and failed to allow into evidence that child pornography was found on K.M.'s computer."[7] Id. We granted the State's petition for review.

## II. DISCUSSION

¶15 This case presents three issues. Two concern instructions not provided to the jury, and the third considers the

---

[6] The circuit court reasoned that Johnson "brought the loaded gun there, and that he was aware that his conduct created that unreasonable and substantial risk of death or bodily harm."

[7] The court of appeals affirmed the circuit court's decision not to instruct on homicide by negligent handling of a dangerous weapon. Johnson, 393 Wis. 2d 688, ¶42. This issue is not before us.

other-acts evidence Johnson sought to introduce regarding the contents of K.M.'s computer on the night of his death. We begin with the jury instructions.

### A. Jury Instructions

### 1. Standard of Review

¶16 "A circuit court has broad discretion in deciding whether to give a requested jury instruction." State v. Coleman, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996). The circuit court's charge is "to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence." State v. Vick, 104 Wis. 2d 678, 690, 312 N.W.2d 489 (1981) (quoting another source). But circuit court discretion is far more limited in some circumstances——including determining whether the evidence presented supports instructing the jury on either perfect self-defense or a lesser-included offense; these are questions of law we review de novo.[8] State v. Peters, 2002 WI App 243, ¶12, 258 Wis. 2d 148, 653 N.W.2d 300; State v. Fitzgerald, 2000 WI App 55, ¶7, 233 Wis. 2d 584, 608 N.W.2d 391.

¶17 "A jury must be instructed on self-defense when a reasonable jury could find that a prudent person in the position of the defendant under the circumstances existing at the time of the incident could believe that he was exercising the privilege of

---

[8] To the extent any statutes are interpreted and applied to this end, that review is also de novo. Quick Charge Kiosk LLC v. Kaul, 2020 WI 54, ¶9, 392 Wis. 2d 35, 944 N.W.2d 598.

self-defense." State v. Stietz, 2017 WI 58, ¶15, 375 Wis. 2d 572, 895 N.W.2d 796. We recently described this benchmark as a low bar which only requires the accused to produce some evidence to support the proposed instruction. Id., ¶16. This standard is met even if the evidence is "weak, insufficient, inconsistent, or of doubtful credibility." Id., ¶17 (quoting another source). Furthermore, circuit courts must not weigh the evidence; rather, the evidence must be viewed in the light most favorable to the defendant. Id., ¶¶13, 18. The instruction should be given based on this low modicum of evidence "unless the evidence is rebutted by the prosecution to the extent that 'no rational jury could entertain a reasonable doubt.'" State v. Schuman, 226 Wis. 2d 398, 404, 595 N.W.2d 86 (Ct. App. 1999) (quoting another source).

¶18 Similarly, a lesser-included offense instruction should be provided if "a jury giving the evidence full credence could reasonably return a verdict of guilt on the lesser included offense." Ross v. State, 61 Wis. 2d 160, 173, 211 N.W.2d 827 (1973). In making this determination, "all relevant and appreciable evidence is viewed in a light most favorable to the defendant." State v. Davis, 144 Wis. 2d 852, 855, 425 N.W.2d 411 (1988). Failure "to instruct on an issue which is raised by the evidence" is error. State v. Weeks, 165 Wis. 2d 200, 208, 477 N.W.2d 642 (Ct. App. 1991) (quoting another source).

### 2. Perfect Self-Defense

¶19 The statutes define two types of self-defense: perfect and imperfect. Imperfect self-defense is an affirmative defense

to first-degree intentional homicide. Wis. Stat. § 940.01(2)(b) (2019-20).[9] It is aptly named because, when successful, it reduces a charge of first-degree intentional homicide to second-degree intentional homicide and therefore does not function as a complete (perfect) defense to a homicide charge. Id. The circuit court gave an imperfect self-defense instruction here.

¶20 Johnson contends the circuit court should have given a perfect self-defense instruction as well. Wisconsin Stat. § 939.48(1) provides the requirements:

> A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

Thus, to receive this instruction, Johnson had to make an objective threshold showing that (1) he reasonably believed he was preventing

---

[9] Under Wis. Stat. § 940.01(2)(b), imperfect self-defense is available when, "Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable." § 940.01(2)(b). If these conditions are met, the defendant could be convicted of second-degree, rather than first-degree, intentional homicide. § 940.01(2); see also Wis. Stat. § 940.05(3) (noting imperfect self-defense is not an affirmative defense to second-degree intentional homicide).

All subsequent references to the Wisconsin Statutes are to the 2019-20 version.

or terminating an unlawful interference with his person, and (2) he intentionally used only the force he reasonably believed was necessary to terminate that interference. State v. Head, 2002 WI 99, ¶4, 255 Wis. 2d 194, 648 N.W.2d 413. Additionally, because he intentionally used force intended or likely to cause great bodily harm or death, Johnson needed to also show he reasonably believed the force he used was necessary to prevent great bodily harm or imminent death to himself. "Unlawful" in § 939.48 is defined as conduct that is "either tortious or expressly prohibited by criminal law or both." § 939.48(6).

¶21 The question here is whether "a reasonable jury could find that a prudent person in the position of [Johnson] under the circumstances existing at the time of the incident could believe" these conditions were met. Stietz, 375 Wis. 2d 572, ¶15. If some evidence from which a jury could so find was presented, the instruction should have been given.[10]

¶22 First, Johnson must show some evidence that he reasonably believed he was preventing or terminating an unlawful interference with his person. Stated another way, we must determine if some evidence was presented from which a jury could find that Johnson reasonably believed he was preventing K.M. from

---

[10] The dissent states we apply an incorrect standard of law by examining the reasonableness of Johnson's beliefs. Dissent, ¶59 & n.6. However, that is exactly what the statute says to do, and exactly what our cases confirm——including those cited by the dissent. See State v. Stietz, 2017 WI 58, ¶68, 375 Wis. 2d 572, 895 N.W.2d 796 (discussing the defendant's reasonable belief); Head, 255 Wis. 2d 194, ¶¶66-67 (same).

harming him without lawful authority to do so. We agree with the court of appeals that the evidence could support such a conclusion.

¶23 Johnson testified that he was not looking for a confrontation with K.M. But when K.M. showed up and closed the door to the computer room, Johnson was left alone in the room with no means of escape, believing K.M. knew precisely why he was there. K.M. then flung the door open and attacked, lunging at Johnson. Even granting the unusual circumstance of seeing an unwelcome family member in one's home in the middle of the night, a reasonable jury could conclude that K.M. engaged in an unprovoked physical attack on his brother-in-law to harm and possibly kill him. The jury knew that K.M. had previously been physically violent with Johnson, and that past history could lend credibility to Johnson's version of events, especially a need to defend himself with lethal force. A reasonable jury could conclude that Johnson reasonably believed K.M.'s attack on him was an unlawful interference with his person.[11]

---

[11] Our self-defense laws also establish a statutory presumption that a homeowner may use lethal force against unlawful or forcible entry into the home, commonly called the castle doctrine. Wis. Stat. § 939.48(1m)(ar). The dissent concludes the castle doctrine should apply to KM's actions, meaning KM lawfully attacked Johnson. Dissent, ¶69. However, we need not determine the scope and meaning of the castle doctrine to rule on the issues before us because we are examining Johnson's, not KM's, actions. Rather, we conclude there is some evidence from which a jury could find that Johnson reasonably believed he was being unlawfully interfered with. The substance and applicability of the castle doctrine does not change or alter that conclusion, and therefore exploring it is unnecessary to decide this case. Nothing in this opinion interprets, applies, or limits the castle doctrine in any way.

12

¶24 Next, Johnson must also present some evidence from which a reasonable jury could conclude he intentionally used only the force he reasonably believed was necessary to terminate the interference with his person. Because Johnson used force intended or likely to cause death or great bodily harm——he shot K.M. five times——he must present some evidence that he reasonably believed this force was necessary to prevent great bodily harm or imminent death to himself. "[T]he personal characteristics and histories of the parties" are relevant to this determination. State v. Jones, 147 Wis. 2d 806, 816, 434 N.W.2d 380 (1989).

¶25 As we've discussed, Johnson testified that K.M. physically, verbally, and sexually abused him, and physically abused his younger sister, starting when they were both young. And Johnson testified that on the night in question, K.M. opened the door, recognized him, and knew why he was there. He then closed the door, and then reopened the door to lunge at Johnson and attack him. From this, the jury could conclude K.M. initiated a violent altercation with Johnson, possibly because he knew Johnson was looking for evidence of child pornography. These facts could be read to provide a motive and historical pattern to substantiate a conclusion that Johnson reasonably believed his life was in danger from K.M.'s attack. Even though Johnson did not recall the details of the physical altercation that led to K.M.'s death, a jury could infer that Johnson intentionally used only the force he reasonably believed would prevent an unlawful interference with his person and that deadly force was necessary

13

to prevent great bodily harm or imminent death.[12] Even though Johnson was not able to describe what happened in detail and why he made the decisions he did when the attack began, a reasonable jury could still infer that Johnson responded with the level of force necessary to stop the attack.

¶26 In sum, we conclude the circuit court erred by declining to instruct on perfect self-defense. Viewing the evidence in the light most favorable to Johnson, there is some evidence from which a reasonable jury could conclude he had an objectively reasonable belief that he was preventing an unlawful interference with his person and that he used only force which was necessary to prevent imminent death or great bodily harm. Because Johnson was entitled to receive the perfect self-defense instruction, we affirm the court of appeals' decision on this issue.[13]

### 3. Second-Degree Reckless Homicide

¶27 With respect to the homicide charge against Johnson, the circuit court instructed the jury on first-degree intentional homicide, second-degree intentional homicide, and first-degree reckless homicide. The court of appeals concluded that the circuit

---

[12] We reiterate that a jury could also reach the opposite result. Our focus is merely on whether a jury could conclude Johnson acted in perfect self-defense, not that it would or should reach that conclusion.

[13] The privilege of self-defense may also be limited when the person claiming self-defense provoked the initial attack. See Wis. Stat. § 939.48(2)(a). The circuit court instructed the jury on provocation, a decision not challenged before us.

14

court should also have instructed the jury on second-degree reckless homicide, and the State challenges that conclusion before us.  If a party requests submission of a lesser included offense, as Johnson did here, the court should instruct the jury if "there are reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense." Fitzgerald, 233 Wis. 2d 584, ¶7 (quoting another source).

¶28  A person who "recklessly causes the death of another human being under circumstances which show utter disregard for human life" is guilty of first-degree reckless homicide.  Wis. Stat. § 940.02(1).  Second-degree reckless homicide, meanwhile, occurs when someone "recklessly causes the death of another human being."  Wis. Stat. § 940.06(1).  The only difference is that "utter disregard for human life" is a required element for first-degree, but not second-degree, reckless homicide.  The parties agree that second-degree reckless homicide is a lesser-included offense of first-degree reckless homicide.  This means that someone who commits first-degree reckless homicide commits the second-degree offense as well.  See State v. Weso, 60 Wis. 2d 404, 408, 210 N.W.2d 442 (1973) (noting that an offense is lesser-included when the defendant "could be convicted of the lesser crime even though he had been charged with and pleaded not guilty to the greater crime").

¶29  "[U]tter disregard for human life is measured objectively, on the basis of what a reasonable person in the defendant's position would have known." State v. Jensen, 2000 WI 84, ¶17, 236 Wis. 2d 521, 613 N.W.2d 170.  "A person acting

15

with utter disregard must possess 'a state of mind which has no regard for the moral or social duties of a human being.'" *State v. Miller*, 2009 WI App 111, ¶33, 320 Wis. 2d 724, 772 N.W.2d 188 (quoting *Wagner v. State*, 76 Wis. 2d 30, 45, 250 N.W.2d 331 (1977)). Utter disregard for human life is interpreted "consistent[ly] with previous interpretations of the 'depraved mind' element that it replaced." *Jensen*, 236 Wis. 2d 521, ¶18. This court has explained:

> To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another. . . . A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment. A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm.

*Weso*, 60 Wis. 2d at 411-12. In analyzing whether the defendant acted with utter disregard for human life, the factfinder examines the "totality of the circumstances" including the time before, during, and after the crime.[14] *State v. Burris*, 2011 WI 32, ¶¶38-39, 41, 333 Wis. 2d 87, 797 N.W.2d 430.

---

[14] When examining the totality of the circumstances, factors that may be considered include:

> the type of act, its nature, why the perpetrator acted as he/she did, the extent of the victim's injuries and the degree of force that was required to cause those injuries. We also consider the type of victim, the victim's age, vulnerability, fragility, and relationship to the perpetrator. And finally, we consider whether the totality of the circumstances showed any regard for the victim's life.

16

¶30 Here, evidence was presented that could lead a reasonable jury to conclude that Johnson's actions did not constitute utter disregard for human life. In his telling, Johnson brought a gun with him for his protection——not to attack K.M. And Johnson combed through K.M.'s computer for two hours without alerting the occupants of the home to his presence. A jury could conclude that Johnson brought the gun intending to use it only if necessary for self-defense, and that his intent was to obtain the evidence he was looking for and leave without K.M. ever knowing he was there. And again, a jury could conclude it was K.M. that instigated a life or death situation by commencing a surprise attack.[15]

¶31 Reading the evidence in the light most favorable to Johnson, there is evidence that he acted in fear for his own life, not necessarily with utter disregard for K.M.'s life.[16] Based on

State v. Jensen, 2000 WI 84, ¶24, 236 Wis. 2d 521, 613 N.W.2d 170 (quoting another source).

[15] Certainly there is evidence that could cause a jury to conclude otherwise——Johnson does not recall how he left the computer room or bypassed KM, or the details of how he shot KM five times.

[16] The court of appeals reached the same conclusion, but reasoned that Johnson's conduct searching for child pornography for the safety of his nieces demonstrates "a regard for the life, safety, and well-being of others." Johnson, 393 Wis. 2d 688, ¶40. In our view, however, the proper inquiry is whether a defendant showed regard for human life with respect to those present during the events in question. See, e.g., Balistreri v. State, 83 Wis. 2d 440, 457-58, 265 N.W.2d 290 (1978) (determining the defendant did not have a "depraved mind" where he attempted to avoid a collision by swerving his car, honking his horn, and braking); State v. Miller, 2009 WI App 111, ¶42, 320 Wis. 2d 724,

this evidence, we conclude that the circuit court should have instructed the jury on second-degree reckless homicide as well. We affirm the decision of the court of appeals on this issue.[17]

## B. Other-Acts Evidence

¶32 Finally, the court of appeals held that the circuit court impermissibly excluded other-acts evidence of what Johnson found on K.M.'s computer on the night of K.M.'s death. Under the rules of evidence, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." Wis. Stat.

---

772 N.W.2d 188 (determining there was no utter disregard for human life when the defendant did not engage physically after being struck, offered help, fired a shot only after the threats became imminent, and called 911 to report the shooting and asked if the victim would be okay).

[17] The State does not argue that the circuit court's failure to instruct on perfect self-defense and second-degree reckless homicide was harmless. We agree that it was not. The jury convicted Johnson of first-degree reckless homicide but acquitted him on charges of first-degree intentional homicide, second-degree intentional homicide, and burglary. This suggests the jury believed at least some of Johnson's testimony. Had the perfect self-defense and second-degree reckless homicide instructions been given, the jury might have concluded either of these standards applied and reached a different outcome. Therefore, the circuit court's decision not to provide these instructions was not harmless, and Johnson is entitled to a new trial on remand. See Wis. Stat. § 805.18(2) (directing the court to determine if the error "affected the substantial rights of the party"); Stietz, 375 Wis. 2d 572, ¶63 ("A defendant's substantial rights remain unaffected (that is, the error is harmless) if it is clear beyond a reasonable doubt that a rational jury would have come to the same conclusion absent the error or if it is clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.").

18

§ 904.04(2)(a). We use a three-step analytical framework to ascertain the admissibility of other-acts evidence:

> (1) Is the other acts evidence offered for an acceptable purpose under Wis. Stat. § (Rule) 904.04(2), such as establishing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident?
>
> (2) Is the other acts evidence relevant, considering the two facets of relevance set forth in Wis. Stat. § (Rule) 904.01? The first consideration in assessing relevance is whether the other acts evidence relates to a fact or proposition that is of consequence to the determination of the action. The second consideration in assessing relevance is whether the evidence has probative value, that is, whether the other acts evidence has a tendency to make the consequential fact or proposition more probable or less probable than it would be without the evidence.
>
> (3) Is the probative value of the other acts evidence substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence? See Wis. Stat. § (Rule) 904.03.

State v. Sullivan, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998) (footnote omitted).

¶33 Johnson contends this evidentiary decision should be reviewed de novo because it implicates his constitutional right to present a defense. We disagree. Outside of certain constitutional commands,[18] a circuit court's day-to-day decisions applying the rules of evidence will only rarely contain a constitutional dimension. "The rights to confront witnesses and to defend

---

[18] The prohibition against unreasonable searches and seizures, for example, raises different questions than ordinary decisions under the rules of evidence to admit or exclude evidence.

19

are . . . not absolute and may bow to accommodate other legitimate interests in the criminal trial process," including the rules of evidence. State v. DeSantis, 155 Wis. 2d 774, 793, 456 N.W.2d 600 (1990). As the United States Supreme Court has explained:

> State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve."

United States v. Scheffer, 523 U.S. 303, 308 (1998) (quoting another source); see also State v. St. George, 2002 WI 50, ¶¶50-51, 252 Wis. 2d 499, 643 N.W.2d 777 (explaining the "accused's right to present evidence is subject to reasonable restrictions" under the rules of evidence). Evidentiary questions of the type raised here——whether evidence is relevant or prejudicial under an other-acts inquiry——are therefore almost always properly reviewed for an erroneous exercise of discretion. DeSantis, 155 Wis. 2d at 793-94. We see no reason to depart from this longstanding appellate rule in this case.

¶34 Under this manner of review, we examine whether "the circuit court applied the proper legal standard to the relevant facts and reached a reasonable discretionary decision." State v. Gutierrez, 2020 WI 52, ¶27, 391 Wis. 2d 799, 943 N.W.2d 870. If it did so, its decision is upheld. Id. And while the court of appeals clearly believed the evidence cut the other way, an appellate court "may not substitute its discretion for that of the circuit court." Id. (quoting another source). Rather, we "look

20

for reasons to sustain a trial court's discretionary decision." Id. (quoting another source).

¶35 The circuit court excluded this evidence on the grounds that it was not relevant and that its probative value would be substantially outweighed by its prejudicial effect under Wis. Stat. § 904.03.[19] Putting aside the circuit court's conclusion that what was found that night was not relevant, it was certainly within the circuit court's discretion to conclude the danger of unfair prejudice substantially outweighed any possible relevance. The circuit court expressed its concern that introduction of this evidence could mislead the jury or cause them to focus on K.M.'s potential criminal behavior related to child pornography rather than the circumstances surrounding his death. Moreover, the court was worried about a trial within a trial regarding whether certain pictures constituted child pornography or not, possibly distracting the jury from the real issues in the case. And while Johnson was not permitted to present direct evidence of what he found on K.M.'s computer, Johnson did testify that he went to the house to look for child pornography and that he believed he found what the police needed.

¶36 This evidentiary decision was a quintessential judgment call of the type we rely on circuit courts to make every day. And whether we would have made the same decision or not, it was a

---

[19] Wis. Stat. § 904.03 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

reasonable call within the bounds of the law. The court of appeals' decision on this issue is reversed.

### III. CONCLUSION

¶37 We conclude the circuit court erred by failing to instruct the jury on perfect self-defense and second-degree reckless homicide. We affirm the court of appeals on these issues, and agree that Johnson is entitled to a new trial on remand.[20] However, the circuit court properly exercised its discretion in denying the admission of the other-acts evidence; we reverse the court of appeals' decision on this issue.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

---

[20] The jury found Johnson guilty of first-degree reckless homicide, acquitted Johnson of burglary, and did not return a verdict on first- and second-degree homicide, greater offenses of first-degree reckless homicide, which served as an "implicit acquittal" on those charges. See Green v. United States, 355 U.S. 184, 190 (1957). Accordingly, on remand the State is precluded from trying Johnson for burglary and first- and second-degree homicide under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. Id. at 190-91; Price v. Georgia, 398 U.S. 323, 329 (1970) ("[T]his Court has consistently refused to rule that jeopardy for an offense continues after an acquittal, whether that acquittal is express or implied by a conviction on a lesser included offense when the jury was given a full opportunity to return a verdict on the greater charge." (footnote omitted)).

¶38 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting).* It is amongst many people's worst fears to be asleep with your family in your own home and realize that someone may have broken in and is in your house. Some might go armed to assess the situation. In this case, the homeowner did not go armed, he was not even dressed. He went without any clothing or weapons to find an armed and dangerous man in his house. When the homeowner confronted the criminal invader, the criminal invader shot the unarmed, naked homeowner dead with his family asleep upstairs. Now the home invader claims he was justified in shooting the homeowner, killing him because the home invader was afraid.

¶39 Today, the court endows the person wrongfully in the home with a jury instruction for perfect self-defense to homicide. I fear that the teaching from the majority's opinion is that criminal home invaders should go armed, shoot first, and later claim to be afraid so to avoid conviction. Every home invader should be afraid——afraid of detection, afraid of confrontation, afraid of being shot by the homeowner, afraid of the police, afraid of being convicted for the crime committed. But being afraid does not mean that the home invader can shoot first in "self-defense." The majority opinion creates a limitless loophole for those who invade another's home so long as they claim to be afraid. The majority opinion unleashes this perfect defense on the innocent public at great cost. This cannot be the law.

¶40 The majority justifies its reasoning, claiming to cabin this perfect defense to this unique group of facts. However, this is unsupported in the law. In fact, the law prohibits anyone from

1

trespassing into another's home. It was the defendant who claimed to be afraid of the homeowner but chose to put himself in closer proximity to the homeowner by breaking into his home. It was the defendant who put himself at risk by wrongfully entering another person's home in the middle of the night. Here, the defendant was not randomly confronted with the need to exercise self-defense—he broke into another's home! Most typically, self-defense is the answer to an unexpected confrontation such that the person is permitted to use the amount of force necessary to escape and retreat. To allow the criminal home invader under these facts the opportunity to claim perfect self-defense is previously unknown in Wisconsin law.

¶41 And what of the Castle Doctrine?[1] The majority dispenses with a homeowner's presumptive right to attack a home invader, stating that it is irrelevant to the analysis. But the law rebuts this claim. To receive the perfect self-defense jury instruction, Johnson had to believe that K.M.'s lunge was unlawful. However, the Castle Doctrine makes clear that K.M. was legally permitted to lunge at—and even possibly kill—Johnson. But the majority balks at the Castle Doctrine, claiming that the Castle Doctrine does not impact this case because Johnson presented "some evidence" of unlawful interference. If the Castle Doctrine does not apply when a homeowner lunges at a home invader who is carrying a gun, then when does it apply? Such ignorance of the purpose underlying the Castle Doctrine is astonishing.

---

[1] The Castle Doctrine, as codified in Wis. Stat. § 939.48(1m), provides a presumptive right for a homeowner to use deadly force against a home invader.

2

¶42 The majority's conclusions cannot be the law. It unwittingly instructs criminals to go armed and shoot to kill during a home invasion, so the invader can claim perfect self-defense and escape criminal liability. The majority green lights vigilantes to break into suspected criminals' homes and take the law into their own hands. The majority undermines a homeowner's presumptive right to defend the home against invaders. Because the law does not permit these unimaginable outcomes, I would hold that Johnson is not entitled to jury instructions on either perfect self-defense or second-degree reckless homicide. Accordingly, I respectfully dissent.[2]

## I. FACTUAL BACKGROUND

¶43 I begin by setting forth relevant facts as established by Johnson's testimony.[3] As will be shown, this case hinges in large part on the testimony presented to the jury.

¶44 Johnson testified that many years before the home invasion and shooting here, Johnson had found child pornography on K.M.'s computer. Johnson stated that he filed a report with the authorities stating that K.M.'s computer contained child pornography. The sheriff's office informed Johnson that there was "nothing [they] could do" about his report and tip because the evidence was "stale." Disappointed that the police did not take

---

[2] However, despite its errors and faults, the majority correctly determined that the circuit court did not err when it excluded certain other-acts evidence.

[3] Johnson's testimony is the only evidence in the record about what occurred on the night Johnson shot and killed K.M.

3

action, Johnson informed his father about the child pornography and the report. Johnson's father confronted K.M. about the child pornography, and K.M. stated that he had "moved" the child pornography.[4]

¶45 Upset that no one had taken any action against K.M., Johnson decided to take the law into his own hands. On the night of October 24, 2016, around 11:45 p.m., Johnson decided he would break into K.M.'s house and obtain "fresh" pictures of child pornography from K.M.'s computer. He decided to break in so late at night "because [he] figured everyone would be asleep." Johnson left to go to K.M.'s house, arming himself with his father's handgun and gloves. Johnson testified that he brought the gloves because he "didn't want to fry any of the equipment" because of static electricity. He also testified that he brought the gun because "[he] wouldn't be able to go in [K.M.'s house]" without it as he needed to feel safe in case K.M. found him after breaking in.

¶46 Johnson arrived at K.M.'s house and parked around the corner. He then proceeded to break into K.M.'s house using the back door. After invading K.M.'s house, Johnson went to K.M.'s computer, with his gun and gloves, to search for what he believed would be child pornography.

---

[4] According to the defendant, Johnson and K.M. had a poor relationship. K.M. was married to Johnson's older sister. Johnson testified that for many years K.M. was physically abusive to him, his younger sister, and his nephew——K.M.'s son. Johnson also testified that on one occasion K.M. put his hands down Johnson's pants. He claimed to be afraid of K.M.

¶47 After searching for over two hours, at around 2:00 a.m. on October 25, 2016, Johnson heard a "scuff" outside of the computer room. Johnson exited out of the programs on the computer, closed it, grabbed the gun, stood up, and walked towards the door. As Johnson was walking towards the door, a naked K.M. opened the door, peered into the darkened room, and saw Johnson. K.M. immediately shut the door while Johnson stood still, gun in hand. Johnson testified that he felt like he had no means to escape the room other than through the door that K.M. just shut. During this standstill, Johnson's sister and nephew were asleep upstairs.

¶48 After a few moments, the door flew open, and K.M. lunged at Johnson. Johnson testified that he did not recall what happened after the lunge, but it is clear what happened based on the evidence. Johnson shot the semi-automatic handgun five times, thus pulling the trigger five individual times, hitting K.M. with each shot. Johnson testified that he did not feel K.M. touch him at any time during this interaction. K.M. died from these gunshot wounds.

¶49 Although he does not remember how he left the room, it is clear that Johnson had to step over K.M.'s body to exit the room. When he exited the room, Johnson was covered in blood. At no time did Johnson call out to his sister or nephew, nor did he render aid to the shot K.M. Instead, Johnson next recalled being several blocks away in the truck he came in, soaked in blood.

¶50 Later the same day, still October 25, 2016, the police began investigating K.M.'s death. The police questioned Johnson twice regarding K.M.'s death. Both times, Johnson lied to the

5

police, stating that he did not know how K.M. died. However, later in the day, Johnson confessed: "Arrest me, I killed him."

## II. STANDARD OF REVIEW

¶51 This case asks the court to determine whether Johnson is entitled to jury instructions for both perfect self-defense and second-degree reckless homicide. "A circuit court has broad discretion in issuing jury instructions based on the facts and circumstances of the case and in deciding whether to give a specific jury instruction requested by the parties." State v. Neumann, 2013 WI 58, ¶89, 348 Wis. 2d 455, 832 N.W.2d 560. "Whether there are sufficient facts to warrant the circuit court's instructing the jury on self-defense is a question of law that the court decides independently of the circuit court and court of appeals, but benefiting from their analyses." State v. Stietz, 2017 WI 58, ¶14, 375 Wis. 2d 572, 895 N.W.2d 572. Similarly, the court decides independently "whether the evidence adduced at trial permits the giving of a lesser-included offense instruction," as this is a question of law. State v. Kramar, 149 Wis. 2d 767, 792, 440 N.W.2d 317 (1989).

¶52 This case also requires the interpretation and application of statutes, which this court does independent of the circuit court and court of appeals. State v. Trammell, 2019 WI 59, ¶16, 387 Wis. 2d 156, 928 N.W.2d 564.

## III. ANALYSIS

¶53 This analysis centers on the majority's erroneous conclusion that the circuit court should have provided a perfect

6

self-defense jury instruction and a second-degree reckless homicide jury instruction. I begin with a discussion of the perfect self-defense jury instruction before turning to the second-degree reckless homicide jury instruction.

### A. Perfect Self-Defense

¶54 Johnson argues that he was entitled to receive the perfect self-defense jury instruction. The circuit court correctly concluded that Johnson was not entitled to receive the perfect self-defense jury instruction.

¶55 In Wisconsin, there are two types of self-defense a defendant can claim: imperfect self-defense and perfect self-defense. Imperfect self-defense is an affirmative defense to first-degree intentional homicide, which is available when "[d]eath was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable." Wis. Stat. § 940.01(2)(b). If found by a jury, imperfect self-defense mitigates first-degree intentional homicide to second-degree intentional homicide. See Wis. Stat. §§ 940.01(2), 940.05(3). The circuit court instructed the jury on imperfect self-defense in this case.

¶56 Unlike imperfect self-defense, which merely mitigates a conviction, perfect self-defense is an affirmative defense that completely bars conviction for certain crimes. See Wis. Stat. §§ 939.45, 939.48(1). Wisconsin codified perfect self-defense in § 939.48(1), which provides:

> A person is privileged to threaten or intentionally use force against another for the purpose of preventing or

7

terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.[5]

Distilling this statute down, perfect self-defense has two elements when the defendant uses deadly force: (1) a reasonable belief in the existence of an unlawful interference that is likely to cause imminent death or great bodily harm; and (2) a reasonable belief that the amount of force the person intentionally used was necessary to prevent imminent death or great bodily harm to the defendant. See State v. Head, 2002 WI 99, ¶84, 255 Wis. 2d 194, 648 N.W.2d 413. However, when determining whether a particular defendant is entitled to a perfect self-defense jury instruction, the "reasonable belief" articulated is from the perspective of a prudent person. Stietz, 375 Wis. 2d 572, ¶15. Phrased another way, to receive the perfect self-defense jury instruction, a defendant had to produce "some evidence" that "a reasonable jury could find that a prudent person in the position of the defendant under the circumstances at the time of the incident could believe that he was exercising the privilege of self-defense." Id., ¶¶15, 16.

¶57 Accordingly, to receive the perfect self-defense jury instruction, Johnson must present some evidence that a reasonable

---

[5] "In this section 'unlawful' means either tortious or expressly prohibited by criminal law or both." Wis. Stat. § 939.48(6).

8

jury could find that (1) a prudent person in Johnson's position would reasonably believe that K.M. was unlawfully interfering in such a way that would cause imminent death or great bodily harm to Johnson, and (2) a prudent person in Johnson's position would reasonably believe that shooting K.M. was necessary to prevent imminent death or great bodily harm to Johnson.

¶58 This is no ordinary self-defense case. This is a case where the defendant used "force which is intended or likely to cause death or great bodily harm." Consequently, the interference must have been the type that is likely to cause "imminent death or great bodily harm" to Johnson. See Wis. Stat. § 939.48(1).

¶59 Moreover, the majority erroneously focuses on whether Johnson, and not a prudent person in Johnson's position, possessed a reasonable belief. Majority op., ¶20.[6] This restatement of the test impermissibly injects Johnson's subjective beliefs at the time of the incident into an inquiry that focuses on what a reasonable jury could find based on what a prudent person in Johnson's position would reasonably believe. See Steitz, 375

---

[6] Although the majority purports to be applying the objective test, it continually restates that it is looking at what Johnson believed and not what a prudent person in Johnson's position would have believed. See majority op., ¶22 ("we must determine if some evidence was presented from which a jury could find that Johnson reasonably believed . . . ."); id., ¶23 ("A reasonable jury could conclude that Johnson reasonably believed . . . ."); id., ¶24 ("Johnson must also present some evidence from which a reasonable jury could conclude he intentionally used only the force he reasonably believed . . . ."); id., ¶25 ("[A] jury could infer that Johnson intentionally used only the force he reasonably believed . . . .") (Emphases added.)

9

Wis. 2d 572, ¶15. This flawed understanding of the objective test colors the majority's entire analysis.

¶60 When we apply the correct, objective standard, it is clear that Johnson has presented no evidence from which a reasonable jury could find that a prudent person in Johnson's position could reasonably believe that K.M. was unlawfully interfering in such a way that would cause imminent death or great bodily harm to Johnson. Similarly, it is clear that Johnson presented no evidence from which a reasonable jury could find that a prudent person in Johnson's position could reasonably believe that shooting K.M. was necessary to prevent imminent death or great bodily harm to Johnson.

### 1. No objective, reasonable belief in the existence of unlawful interference

¶61 For two independently sufficient reasons, Johnson cannot show that he provided sufficient evidence of K.M.'s alleged unlawful interference that was likely to cause imminent death or great bodily harm to Johnson. First, K.M. was not acting unlawfully because his conduct was protected by the Castle Doctrine. Second, Johnson has provided no objective facts that demonstrate that a reasonable jury could find that a prudent person in Johnson's position would reasonably believe that K.M. was unlawfully acting in such a way that would cause imminent death or great bodily harm to Johnson.

### a. Castle Doctrine

¶62 K.M.'s alleged interference was not unlawful because it was protected by the Castle Doctrine. The Castle Doctrine extends the self-defense privilege in the context of the home to include

10

the presumptive right to use deadly force. See Wis. Stat. § 939.48(1m); see also State v. Christen, 2021 WI 39, ¶44, 396 Wis. 2d 705, 958 N.W.2d 746. When a homeowner uses deadly force against a person that the homeowner reasonably believed unlawfully and forcibly entered the homeowner's dwelling, "the court may not consider whether the actor had an opportunity to flee or retreat before [the homeowner] used force and shall presume that the [homeowner] reasonably believed that the force was necessary to prevent imminent death or great bodily harm to himself or herself." Wis. Stat. § 939.48(1m)(ar). This means that when a homeowner finds someone in their home and the homeowner reasonably believes that person broke into the home, the homeowner has the presumptive right to use deadly force against the invader.

¶63 The Castle Doctrine intersects with this case because Johnson was just such an invader in K.M.'s home. Johnson broke into K.M.'s home in the middle of the night, and K.M. found him as an invader——satisfying the first aspect of the Castle Doctrine. Consequently, the court must presume that any force K.M. was going to use was necessary, even if it was deadly force.

¶64 As relevant to the perfect self-defense jury instruction, Johnson had to reasonably believe that K.M. was acting under the Castle Doctrine. "[E]very person is expected to know the law." Neumann, 348 Wis. 2d 455, ¶50 n.29; see also Byrne v. State, 12 Wis. 519 (1860) ("[D]efendants are presumed to know the law . . . ."). As such, we presume that Johnson knows the Castle Doctrine. Because Johnson is presumed to know of the Castle Doctrine, it is clear that an objective, prudent person in

11

Johnson's position would know that the homeowner——here, K.M.——could legally use deadly force on the person when found after a break-in. Accordingly, Johnson cannot show that K.M.'s lunge was an unlawful interference because K.M. was presumptively permitted to lunge at and attack Johnson as an invader in his home.

¶65 Johnson attempts to circumvent this conclusion by arguing that K.M. was actively engaged in a criminal activity; namely, possession of child pornography. Johnson is correct that a homeowner cannot rely on the Castle Doctrine when the homeowner is "engaged in a criminal activity . . . at the time." Wis. Stat. § 938.48(1m)(b)1. However, mere speculation of criminal activity cannot form the basis of overriding a homeowner's presumptive right to use deadly force against a home invader; the homeowner must actually be engaged in a criminal activity at the time. Id. There is no evidence in the record that, at the time Johnson broke into K.M.'s house, K.M. was engaged in any criminal activity. Johnson alleges that he found child pornography on the computer that he broke into the house to search; no such child pornography was admitted into the record. Accordingly, K.M. was entitled to the Castle Doctrine's presumption of the right to use deadly force. Johnson failed to present any evidence that would overcome this presumption.

¶66 The majority ignores the Castle Doctrine's impact on this case, opening the door for vigilante justice and providing motivation to home invaders to shoot to kill so they can claim perfect self-defense. The law and its procedures not only protect the accused, but also the victim. See Wis. Const. art. I, § 9m.

12

The majority ignores K.M.'s presumptive right to defend his home and his family against a home invader. Instead, the majority green lights a home invader's attempt to escape all liability and dilutes a homeowner's presumptive right to protect the home against those invaders. I would not allow such a green light, and I would apply the Castle Doctrine to K.M.'s actions, meaning that K.M.'s actions were lawful; and therefore, Johnson is not entitled to a perfect self-defense jury instruction.

### b. No evidence

¶67 The Castle Doctrine notwithstanding, Johnson did not proffer any evidence from which a reasonable jury could find that a prudent person in Johnson's position would reasonably believe that K.M. was unlawfully acting in such a way that would cause imminent death or great bodily harm to Johnson. Because the analysis must be from the perspective of the objective, prudent person, I begin by setting forth the facts, not Johnson's feelings or characterizations, in the light most favorable to Johnson.[7]

¶68 Here, Johnson entered K.M.'s house in the middle of the night. Johnson arrived with gloves, a gun, and a plan: to investigate K.M. and discover what he thought was criminal

---

[7] Included in these facts are "the personal characteristics and histories of the parties" as those characteristics and histories are part of the record. State v. Jones, 147 Wis. 2d 806, 816, 434 N.W.2d 380 (1989). In the context of claims of self-defense, this type of evidence is commonly referred to as McMorris evidence; that is, "evidence of violent acts the victim had committed which [the defendant] knew about at the time of the alleged crime, and which would bear on the reasonableness of the claim of self-defense." State v. McClaren, 2009 WI 69, ¶1, 318 Wis. 2d 739, 767 N.W.2d 550 (citing McMorris v. State, 58 Wis. 2d 144, 205 N.W.2d 559 (1973)).

activity. After several hours of investigating on K.M.'s computer, Johnson heard a noise, closed the computer, grabbed the gun, and headed to the door. A naked K.M. opened the door, peered into a darkened room, and saw Johnson. K.M. then immediately closed the door. Johnson stood there, gun in hand, and did not make a move. Johnson knew of K.M.'s history of choking people, pulling hair, squeezing heads, and punching people, and that K.M. was much larger than himself. K.M. then opened the door and lunged at Johnson. In response, Johnson shot K.M. five times, killing K.M.

¶69 These are the objective facts, presented in the light most favorable to Johnson, from his own testimony. Johnson had to supply evidence that K.M.'s interference was likely to cause imminent death or great bodily harm to Johnson. A mere lunge can hardly be characterized as likely to cause imminent death or great bodily harm. Simply put, Johnson presented no evidence that K.M.'s alleged unlawful interference was likely to cause imminent death or great bodily harm to Johnson. Accordingly, Johnson is not entitled to receive the perfect self-defense jury instruction.

### 2. No objective, reasonable belief that killing K.M. was necessary to prevent imminent death or great bodily harm.

¶70 For two independently sufficient reasons, Johnson cannot show that he provided sufficient evidence from which a reasonable jury could conclude that a prudent person in Johnson's position would reasonably believe that killing K.M. was necessary to prevent imminent death or great bodily harm to Johnson. First, Johnson was unlawfully in K.M.'s home, creating the danger by his own wrongful conduct. As such, his force was legally not necessary

14

because he unlawfully sought out the danger that caused him to exercise "self-defense." Second, Johnson has provided no evidence that shooting and killing K.M. was necessary to prevent imminent death or great bodily harm to Johnson.

### a. No perfect self-defense when creating the danger

¶71 Over a century ago, this court stated the rule of self-defense generally requires a person to have the right to be in the location where self-defense is exercised:

> [The common law rule of retreat] has been superseded by a doctrine in harmony with the divine right of self-defense; the doctrine that when one is where he has a right to be and does not create the danger by his own wrongful conduct, he may stand his ground, if assailed by another . . . .

Miller v. State, 139 Wis. 57, 75, 119 N.W. 850 (1909) (emphasis added); see also State v. Watkins, 2002 WI 101, ¶¶91-94, 255 Wis. 2d 265, 647 N.W.2d 244 (explaining that the rule from Miller must be considered when determining whether the force used was necessary). Thus, a defendant generally cannot claim self-defense if he or she was illegally in the place where self-defense was used because this conflicts with the principle of retreat. Here, the defendant did the opposite of retreat. Johnson broke into K.M.'s home and placed himself in a situation where the reasonable person would suspect that the homeowner may attack a home invader. The logic of retreat and self-defense is to avoid possible confrontation and use force only when necessary to protect oneself. The majority does not address retreat, nor the fact that Johnson broke into K.M.'s house while armed with the specific intention of protecting himself against attack. Johnson's "self-defense" can

15

hardly be called necessary when he sought out the situation where he would have to use self-defense.

¶72 Allowing a defendant who seeks out life-threatening danger by breaking into a home to claim self-defense also fundamentally undermines a homeowner's Second Amendment right to "possess and carry weapons in case of confrontation." Christen, 396 Wis. 2d 705, ¶43 (quoting District of Columbia v. Heller, 554 U.S. 570, 592 (2008)).  Under the majority's logic, a domestic abuser could know that his or her victim keeps a firearm in a bedside drawer for defense, as is constitutionally permitted.  The abuser could then bring a gun to "defend themselves" because the abuser knows of the victim's firearm.  Then, the abuser could enter the victim's home——under the pretenses of investigating alleged criminal activity——shoot the domestic abuse victim, and claim that he or she feared for his or her life because the victim had a gun. Such backward logic transforms a homeowner's lawful right to possess a firearm for home defense into the catalyst for a home invader to shoot a homeowner and receive perfect self-defense. This example of a domestic abuse situation is not alone.  Consider rival gang members who have bad blood, breaking and entering into another's home with a gun, shooting another, claiming to be afraid of another, and asserting perfect self-defense.  And the examples could go on and on without limitation.  This is not, and cannot, be the law.

¶73 Because Johnson unlawfully sought out the danger, by breaking into K.M.'s home, that required him to exercise "self-defense," Johnson cannot now claim that the amount of force he

16

used was necessary. Johnson should never have been in K.M.'s home. Accordingly, Johnson is not legally entitled to a perfect self-defense jury instruction.

b. No evidence

¶74 Johnson also presented no evidence that shooting and killing K.M. was necessary to prevent imminent death or great bodily harm to Johnson. As I just discussed, there was no threat of imminent death or great bodily harm. Even beyond that simple fact, Johnson proffered no testimony that shooting and killing K.M. was necessary. Johnson testified that he has no memory from the time K.M. lunged at him until several minutes later when he clearly recalls driving home with blood-soaked clothing. During the critical period of when Johnson pulled the trigger, he recalls nothing—not pulling the trigger, the sound of the gun, nor stepping over K.M.'s body to exit the room.

¶75 Johnson provided a complete dearth of evidence as to the necessity. Because Johnson presented no evidence as to why or how he pulled the trigger, killing K.M., a reasonable jury must look at what was known up until the time of the lunge from the perspective of an objective, prudent person, not Johnson's statement of his own perspective. Johnson testified that he knew that his sister and his nephew were sleeping in a room adjacent to where the interaction occurred. He acknowledged that he could have called out to them for assistance or to alert them to any impendent threat to life and limb.

¶76 Johnson argues that K.M. knew he found evidence of criminal activity, and so K.M. was attempting to kill him to

17

prevent him from going to the police with the evidence. Consequently, his force was necessary to prevent K.M.'s imminent threat to life and limb. Despite Johnson's characterizations, there is simply no evidence in the record that K.M. was engaged in criminal activity, nor is there any evidence in the record from which a reasonable jury could conclude that a prudent person in Johnson's position would believe this.

¶77 In sum, there is a complete lack of evidence that K.M.'s lunge was going to cause imminent death or great bodily harm and that Johnson shooting K.M. was necessary to prevent imminent death or great bodily harm. Consequently, Johnson was not entitled to a perfect self-defense jury instruction.

### B. Second-Degree Reckless Homicide

¶78 Johnson was not entitled to receive a jury instruction on second-degree reckless homicide as a lesser-included offense to first-degree reckless homicide. We have adopted a two-step process to determine "whether a lesser included instruction should be given." State v. Muentner, 138 Wis. 2d 374, 387, 406 N.W.2d 415 (1987). The first step of this process is to "determine, as a matter of law, whether the offense was lesser included." Id. "Wisconsin has adopted the 'elements only' test," which means that a lesser included crime is "[a] crime which does not require proof of any fact in addition to those which must be proved for the crime charged." State v. Jones, 228 Wis. 2d 593, 598, 598 N.W.2d 259 (Ct. App. 1999) (alteration in original) (citation omitted). If the offense was lesser included, "[t]he second step is to determine whether there is a reasonable basis in the evidence for an

acquittal on the greater charge and for a conviction on the lesser charge." Muentner, 138 Wis. 2d at 386. "[T]he second step involves a weighing of evidence which would be presented to the jury. Thus, the court is assessing the likelihood that the jury would find all the elements of the particular crime." Id.

¶79 Here, Johnson was charged, and convicted of, first-degree reckless homicide. To be found guilty of first-degree reckless homicide, a person must "recklessly cause the death of another human being under circumstances which show utter disregard for human life." Wis. Stat. § 940.02(1).[8] Johnson is seeking to receive a jury instruction on second-degree reckless homicide. To be found guilty of second-degree reckless homicide, a person must "recklessly cause the death of another human being."[9]

¶80 Applying the first step to determine whether a lesser-included offense jury instruction is required, we must compare the elements of first- and second-degree reckless homicide. Jones, 228 Wis. 2d at 598. When we compare the elements, every element of second-degree reckless homicide must be proven for a person to be convicted of first-degree reckless homicide. Accordingly, second-degree reckless homicide is a lesser-included offense of first-degree reckless homicide.

---

[8] There are other circumstances under which an individual may be found guilty of first-degree reckless homicide. Wis. Stat. § 940.02(1m), (2). However, these other circumstances are not at issue in this case.

[9] A person can also be found guilty of second-degree reckless homicide if the person "recklessly causes the death of an unborn child." Wis. Stat. § 940.06(2).

19

¶81 Having determined that second-degree reckless homicide is a lesser-included offense of first-degree reckless homicide, we turn to step two: "whether there is a reasonable basis in the evidence for an acquittal on the greater charge and for a conviction on the lesser charge." Muentner, 138 Wis. 2d at 387. Because "utter disregard for human life" is the only element that is different between first- and second-degree reckless homicide, we must weigh the facts of this case and determine whether Johnson acted with an utter disregard for human life. Id. Accordingly, if we weigh the evidence and determine that no reasonable jury could determine that Johnson did not act with an utter disregard for human life, Johnson would not be entitled to a jury instruction on second-degree reckless homicide.

¶82 "[U]tter disregard for human life is measured objectively, on the basis of what a reasonable person in the defendant's position would have known." State v. Jensen, 2000 WI 84, ¶17, 236 Wis. 2d 521, 613 N.W.2d 170.[10] If utter disregard for human life is proven, "the offender is considered more culpable because the conduct, according to the standards observed by the great mass of mankind, went beyond simple criminal recklessness to encompass something that, although falling short of an intentional crime, still deserves to be treated more seriously under the law and punished more severely." Id. "In evaluating the proof of

---

[10] I agree with the majority that "the proper inquiry is whether a defendant showed regard for human life with respect to those present during the events in question" and not a general regard for the wellbeing and safety of those not present. Majority op., ¶31 n.16.

utter disregard for human life, the factfinder is to consider all the factors relating to the conduct including what the defendant was doing; why he was doing it; how dangerous the conduct was; how obvious the danger was and whether the conduct showed any regard for human life." Id., ¶24 (cleaned up).[11]

¶83 Here, no reasonable jury could conclude that Johnson acted without utter disregard for human life. Johnson carried a gun and gloves to break into his brother-in-law's house in the middle of the night. After spending several hours in the house as an invader, Johnson heard a noise outside of the computer room. Instead of calling out to his brother-in-law, his sister, or his nephew, Johnson covered his tracks, closing the computer and walking towards the door, gun in hand. After K.M. lunged into the room, Johnson pulled the trigger of his gun five individual times with each of the shots hitting K.M., including in his back and head. Instead of alerting his sister or nephew that he just shot K.M., Johnson stepped over K.M.'s body and fled the scene. At no time did Johnson render aid to K.M. nor did he attempt to show any regard for his callous act of shooting another man. Based on these facts, no reasonable jury could conclude that Johnson acted without utter disregard for K.M.'s life.

¶84 The majority ignores several key facts in its analysis of the night in question. Namely, the majority ignores that

---

[11] The phrasing of these factors has changed over time. Compare State v. Edmunds, 229 Wis. 2d 67, 77, 598 N.W.2d 290 (1999), with Wis JI——Criminal 1022 (2015). But the underlying factors have remained unchanged——we must observe the totality of the circumstances from the perspective of a reasonable person in the defendant's position.

21

Johnson shot K.M. five times, never called for assistance from his nearby sister or nephew——either before the murder or after——never rendered aid to K.M., then stepped over K.M.'s body, and fled the scene. Instead of observing the "totality of the circumstances," the majority focuses on the fact that Johnson said that he brought a gun with the intent of using it for self-defense. Majority op., ¶30. The majority's cherry-picking of facts demonstrates that the majority is not considering the totality of circumstances. When we observe all of the facts and weigh them, it is clear that no reasonable jury could conclude that Johnson acted without utter disregard for K.M.'s life. Accordingly, Johnson is not entitled to a second-degree reckless homicide jury instruction.

## IV. CONCLUSION

¶85 The majority's conclusions cannot be the law. It unwittingly instructs criminals to go armed and shoot to kill during a home invasion, so the invader can claim perfect self-defense and escape criminal liability. The majority green lights vigilantes to break into suspected criminals homes and take the law into their own hands. The majority undermines a homeowner's presumptive right to defend the home against invaders. Because the law does not permit these unimaginable outcomes, I would hold that Johnson is not entitled to jury instructions on either perfect self-defense or second-degree reckless homicide.

¶86 For the foregoing reasons, I respectfully dissent.

¶87 I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this dissent.

¶88 I am also authorized to state the Justice JILL J. KAROFSKY joins ¶¶1-3, 5-23, and 30-48 of this dissent.